Go to the link in the description and subscribe to my channel!  Thank you for watching! Jack Hagen, I represent U.S. Phillips Corporation, the assignee for Mr. Knighton. With me at the table is Mr. Lieberchuck. As I understand it, you have saved seven minutes for your rebuttal? That's correct, sir. You know that all you can cover is what the patent office will raise in its reply? I'm hoping they'll raise some good issues. Good. I'm sure they will. Mr. Knighton's invention concerns protection of content material, music, movies, books, that are transmitted or stored on signals. His inventions involve a technique called digital watermarking, which is a way of embedding identification information into those signals. It's an older art, and he made improvements that increase the fidelity, reduce the noise in the music or in the movies. Mr. Hagen, as I understand Claim 14, it does not recite a series of voltage levels or a sequence of plus one, minus one, etc. My question is, why is this claim any less abstract than the claim to an algorithm in Benson? The claim is not for the data. First of all, it's not an electrical claim. It doesn't involve any electrical signals at all. It is a way of packaging data. The information, the Benson-type abstract ideas, are the music, the movie, if you would. But you have to put them in a physical form in order to store them and in order to transmit them. The analogy we use in the brief is you have to put them in a container. You have to do things to them, mandate things to them, in order to put them in that form, and that's what we're trying to protect. So you're saying that in Benson, the relationship between binary coded decimal and binary numbers was strictly a mathematical relationship, a principle, as opposed to this claim, which is directed to something that is a man-made sequence of some sort that's not a fundamental relationship. I think I agree with your characterization of Benson. If I'm wrong or if there's clarification, feel free. Well, Benson, I believe, in line with the later cases, held that somehow a mathematical principle or an idea of nature is being completely taken up, completely protected by the patents, withdrawn from the public. We are not trying to withdraw any abstract ideas. What we are trying to do is to take a structure for packaging and for transmitting those ideas, an arrangement for transmitting them, and we're trying to protect them. But counsel, see, that's my problem. You said structure for transmitting. You already have claims to the method of producing and the structures that produce, but you're not claiming. Claim 14 isn't to a structure. It's to the signal itself. I'm troubled at how it fits within one of the four statutory subject matters. The signal that we are trying to protect is not the data, it's not the ideas, it's not the generalizations, the abstractions. It's a man-made way of arranging, producing, packaging that data, embedding it, encoding it, embedding it with supplemental data to reduce the noise that allows it to take a physical form and to be transmitted or stored. But what is a physical form? Is a physical form a signal, electrical signal? An electrical signal is an example of a physical form. A mechanical signal, the pits on the surface of a DVD or CD is a physical form. The modification of the chemical structure of a recordable CD is a physical form. Now, if I sat down and did an analysis with a binary signal and then superimposed a watermark on that binary signal, just on a piece of paper, would I be infringing the claim? I don't believe that the written abstraction, if you like, the words that you put on the paper, would be a signal.  It would be a digital signal, a binary signal, showing essentially the form of the wave and superimposing upon that the watermark, as you have described. Now, is that infringing the Claim 14? I'm troubled, Judge Carharsa, by the idea that the words written on the paper, the... Not words, the binary signal, just showing the binary signal on a piece of paper. You're representing a signal in a written form, and if that representation of the signal was the signal itself, I guess it would infringe, but I don't believe that's the signal. Well, the Claim 14, though, states a signal with embedded supplemental data, the signal being encoded in accordance and giving an encoding process, and selected samples of the signal representing the supplemental data. Now, if I do that on a piece of paper, I would be infringing that claim, wouldn't I? What you put on the paper is the signal, yes, sir. Now, with respect to that, if in fact I have a signal, which is an electrical signal and it carries a carrier wave, and on top of that carrier wave I add an audio signal, would that be infringing the patent, the Claim 14? Yes, sir, if I understand what you said. So every radio signal which is broadcast on a carrier wave plus an audio signal which is carried by the carrier wave would be infringing the Claim 14? No, sir, and I guess I misunderstood. If you transmit an audio signal which is encoded onto a carrier wave, that is the first part of the claim, if you will, and if you added supplemental data to that to reduce the noise and supplemental modulations of the signal voltage levels, carrier levels, changed according to the limitations in Claim 14, yes, sir, it would be infringing. So how would I distinguish that then from any radio signal which is broadcast in today's world by a radio signal? A radio signal is basically a carrier wave plus an audio signal superimposed on top of that. If I then add some attenuating signals to the audio signal to eliminate some of the static, that would be infringing Claim 14. If there is a limitation in Claim 14 about the additional signals preceding the selected samples of the audio signal, yes, sir, it would be infringing if you used Mr. Knighton's invention or the claimed invention in the order that it's presented here, yes. Do I need to have, in conjunction with that, under 101, a claim towards an apparatus generating the signal, or can just the signal itself be eligible for patentability under 101? Well, we have apparatus claims that the Patent Office allows, sir. No, but there's no apparatus requirement in the Claim 14, though, is there? Well, there's no apparatus. Claim 14 is directed to the signal per se because of the way the industry has changed, the way that these things are now generated over the Internet and distributed systems makes it very hard to find a single infringer, a single piece of apparatus in a location that's considered infringing under the U.S. Patent Law. So these claims, we believe, and I think some of the amici in the IPO believe, are very important commercially for that reason. Counsel, if you could come back for a second just to my idea, which is the statutory subject matter language of 101 and the four categories in particular, and tell me how it is that a signal falls into one of those, because that's where I'm struggling. Well, as we said in our brief, Your Honor, first of all, we think that there's overlap between those categories, that it's not necessary to try to finally divide up and find one category and not overlap with some of the categories. We've argued that it's a material. We've argued that it's a machine. We've argued that it's a process. I assume by material you mean manufacturing. Manufacturing, yes. Okay. And so it's a process, and you think that a series of steps is not required for something to be a process? I think a series of steps is not required for a process. Well, define process for me then. Tell me how I should define process, because I have to interpret the statute, and I have to apply that interpretation broadly to lots of different kinds of inventions. So how should I define process if not a series or acts? I think a process, if you look at Section 100, which tells you what a process is, and it's a circular definition, unfortunately, it says a process is a process and then some other things. And one of the other things are arts. I think signaling is a technological art. I think that the patent law in the 1952 Act was written. The intention was to include everything that was included prior to 1952, processed income into the statute until 1952. And I think the broad definition of technological arts includes signals, signaling, devices for carrying out art. So if I understood your argument from the brief, really, what you suggested was a signal is a process because it's useful. Is that right? Am I oversimplifying it? I think that a signal is a process because a signal is a technological art. It's probably close to what we call useful today in the United States, the idea of technological applicability. And I think that anything that's a mechanism of practicing an art is what Congress intended to include when they added Section 100 to tell you to instruct us all what a process is. So by that definition, it just seems that everything would be a process according to the statute. Well, I think that we have to look at the Supreme Court at Jacobati, and I think that anything under the sun created by man doesn't fall under several of those exceptions, the abstract idea of the other exceptions. Yes, I think the Supreme Court has said quite clearly Section 101 should be broadly interpreted. So every electrical signal, notwithstanding any limitations, would be patentable. Any electrical signal carrying a bit of information? Any electrical signal subject, as we say in our brief, to it being tangible, to it being concrete. Tangible, as I understand it, means that you can measure it, that you can distinguish it from the background, that you can tell it's there. Concrete means it's reproducible, it's not a random event. But yes, I believe that it is. Is the Ronnie V. Morse case, which is an older U.S. Supreme Court case back in 1854, is that still a valid law in your judgment, as far as 101 is concerned? This was a Morse code transmission. I mean, clearly, sir, Section 101 wasn't around back when they decided we're leaving Morse, and the broad Morse claim that was disallowed, that people talk about being a Section 101 or a patentable subject matter disallowance, was in fact an overly broad claiming disallowance, that it was claiming more than it invented. There's no rejection of that sort in this case today. In that case, there was a claim that was allowed or held patentable that was, in many respects, I think quite similar to the claim at issue here. It's the fifth claim that reads, I claim in my invention the system of signs consisting of dots and spaces and of dot spaces and horizontal lines for numerals, letters, words, or sentences substantially as herein set forth and illustrated for telegraphic purposes. As I read that claim, it sounds very much like the signal claim at issue here. Do you agree? From what I understood that you said, yes, sir, I do. Now, obviously, that was decided under a different statutory scheme that was found to be, as I read that case, an art. In effect, even though it reads like a manufacturer, a system of signs was nonetheless construed to be a patentable art, which we've subsequently learned means process or method or something similar to that. Perhaps it's a broader term than process or method, but nonetheless similar to that. But I do think there are some parallels. But it seems to me here we have two issues. One relates to the question of whether this claim is an abstract idea and falls under that exception or whether there's a tangibility requirement. It seems there are two separate questions. In terms of the abstract idea, we talked earlier about Benson. And it does strike me that even though this claim is extremely broad, not limited to an electrical signal, this is not the kind of abstract idea that was the subject of Benson or Fluke or Deere or any of these other cases. And for that reason, it seems to me that you can fairly easily overcome that burden, that hurdle. Where I'm having trouble is on the tangible side. That brings in the question of statements that were made in the Chakrabarti case and about manufacturers being things that are made from physical things. Why is that not determinative of this case? Well, I think the Chakrabarti, the quote in Chakrabarti, which I think goes back to the American fruit growers case, was cited fairly as an example of what a manufacturer could be. I don't think it was exclusive. It was an example. I think, again, Chakrabarti and cases like AT&T from this court reflect on the fact that Section 101 should be broadly inclusive, that the word any in Section 101 is an including term and a broadening term. I think the main point, though, about the signals in this case and about signals at all is that in order for signals to be useful, for them to be used in these signaling technologies and the technologies that we're talking about, they have to be measurable. The kinds of signals that are not measurable, the abstractions that we talk about, the signal of the flock of birds being the signal of oncoming cold weather or something like that, those aren't the signals we're talking about. In the context of the patent application and the context of the technology and in the context of specific language of claim of 14, we're talking about man-made signals and we're talking about things that can be distinguished from the background. Are you saying even if there is a tangibility requirement that the tangibility requirement is met here because of the inherent nature of a signal as having to be something that can be manifest in some way or perceived in some way? Yes, I'm agreeing that there is a tangibility requirement. I'm saying yes, sir, it's met. Mr. Aiken, we'll give you five minutes of rebuttal time to answer a lot of questions. Mr. Chen. Good afternoon, Your Honor. May it please the Court. Before I go into talking about signals, as I understand signals to mean, that is information carried on a carrier wave or electrical signal, I first want to talk about the claim drafting question, which is really the abstract idea issue that's in the Board decision. First of all, you're correct, Judge Lind, that this claim doesn't preside in the voltage levels or anything like that. In fact, this claim is a concept claim that's disembodied from any tangible medium and this claim is not tied to the physical real world. And so therefore... But the claim does call for a signal. Yes. And something cannot function as a signal unless there is something that is perceivable. Yes, Your Honor. It's sort of like, you know, if a tree falls in the forest and no one is there, do you hear it? That kind of thing. A signal that isn't somehow perceptible by somebody doesn't function as a signal. So doesn't that make it sort of manifest in some form or another? Maybe it's in the form of electricity or electrons and this claim is written sufficiently broadly that it's not limited to that, but even if it's photons transmitting by light or something of that sort, nonetheless to be a signal there has to be some physical manifestation of some sort otherwise nobody would hear it or see it. And every example that you just gave was for a physical signal that was being transmitted in the real world. However, I believe, as the example was already discussed earlier, this claim as it's drafted is so broad that it can encompass a string of ones and minus ones that ultimately represent an audio signal where in that string of ones and minus ones you were writing down you flip a bit here or there in order to accommodate for a supplemental string of data and then therefore that's why we believe that this claim is so broad that it can include even that. It's simply a series of ones and minus ones. Mr. Chen, is that because it's an abstract idea or is it because the signal itself cannot be seen, heard, or otherwise tangible, the tangibility aspect of it? And that gets to the second issue. But going to the first issue of abstract idea, I think another way of looking at it is this claim does not fit within one of the four categories of Section 1 because when you have a claim drafted so broadly that it can be a series of ones and minus ones, that simply doesn't fit within any of the four categories. It's kind of like in Ray Warmerdam where this court had to look at a claim just for a data structure per se. It wasn't attached to a memory or anything like that. It was just the data structure per se. And this court held it affirmed the Board's 101 objection there finding that it wasn't attached to any kind of physical hardware or didn't have any physical context. And so therefore it didn't meet any of the four categories. But this is not just a series of plus ones and minus ones. It's a data stream of signals set forth in a certain way with certain specified characteristics with the encoding and the sampling. And clearly that's not something that occurs in nature. It's not an actual phenomenon. It's not a theorem. It's something that is man-made. It is something that is clearly set forth in the claim, broadly written as it may be, and it's something that clearly has utility. So wherein lies the problem? I think the problem here with the way it's broadly drafted, first of all, it doesn't say anything about reducing noise. It doesn't say anything about a watermark. It doesn't say anything about an audio or video signal. It's just streams of data. Well, the intended use is not a necessary requirement. And it clearly has utility. Well, software per se has utility too, but we don't give out patents on just the software code itself. Similarly, like in Warmerdam, we don't give out patents just on data structure. Are you saying the PTO has not given any software patents? We don't give out patents on software per se by itself. Of course we give out software patents when it's connected to a machine or when it's connected to a memory or part of a larger process. What about AT&T versus Excel? It seemed to me those claims were more broadly construed as directed just to software. They weren't means-plus-function claims. AT&T was ultimately what happened there was the transformation of data that produced a signal that was useful for billing purposes. So yes, of course there was software being used there, but it was part of this larger process that created a final billing signal at the very end. And so in that sense, that is how software can be patented. But just by trying to patent software itself, the code itself, we don't give out patents on that. We don't give out patents on data structures by itself. We will if it's in a memory, because that was the Lowry case. Lowry noted that in that particular instance, Mr. Lowry was not claiming an attributive data model, data structure by itself in the abstract, but in fact it was claimed with the memory and thereby giving some kind of physical organizational structure to the memory. And that is a permissible way to claim the data structure. Counsel, I don't mean to, I think I probably pulled you off target. And I didn't mean to do that, because Judge Lynn asked an important question, which I think focused on, look, there's utility, it's purposeful, the claim is clearly drafted, I'll be abroad, what's the problem? And it seems to me, you might have been going down the road of saying the problem is that it doesn't fit into one of the statutory subject matters and that that's a statute that we don't have the ability to just overlook or wave our hands at and that utility is a separate component of 101. And if that's where you're going, I want to give you a chance to get there so you can respond to his question, so I don't pull you off track. Let me get to that now. Now, just stepping aside from how you're supposed to claim this, getting to the question of whether an electrical signal actually falls within one of the four categories. An electrical signal, per se. Right. A carrier with information, man-manipulated energy forms. Is that eligible? Does that fall within one of the four categories? When the agency a couple years ago did a top-down review of 101 eligibility and ultimately issued its interim guidelines on eligibility, we also in that saw this rather unique issue of signal claims and had to ask ourselves, well, what are they? What are they made of? What statutory category do they fit in? And ultimately we saw they don't fall within a typical apparatus or a method or a compound. And so we looked through the case law and it didn't seem like there was any cases that have ever held or suggested that intangible subject matter is eligible for patent. And so, therefore, we feel like in order to fit anywhere, this would have to be a manufacturer. And we don't believe that a manufacturer can be something that doesn't have any matter in it. And that's, in fact, what these signals are. This is purely just information and energy. And so the question is how can that be within a manufacturer as that term is used in Section 101 and as to how it's been interpreted by the Supreme Court as well as this Court. Starting with American Fruit Growers in 1930, that court said a manufacturer, it used the plain ordinary meaning of the term, which is a common, obviously, statutory canon of construction, and said it manufactures the production of articles from raw materials. Then 50 years later in Chakrabarti, the Supreme Court reiterated that same interpretation and reaffirmed it. And then just recently, this Court in related context, in 271G context, used that same definition of manufacture and essentially read that to be synonymous with what a 271G product made by a patented process is. And in the Bayer case... But that uses the word product, not manufacture. Absolutely, that is correct. But nevertheless, what was interesting about that case was the way it analyzed what product means. And in doing that, in the Bayer case, it specifically and very clearly and very directly linked 271G products with 101 manufacturers. In Bayer, this Court had to deal with a difficult situation of trying to figure out what kind of products, or what does product mean? Does it mean any and all kinds of outputs that come from a patented process? Or should it be something more specific, more tangible? And ultimately, the Court decided to go with this more restricted scope of the meaning of product. And in doing that, it defined product to mean the same thing as manufacturing. And because this Court said that manufacturing means the tangible object, a physical product, a physical good, therefore, likewise, a 271G product also must mean the same thing. And in Bayer, all that was being produced from that patent process was information. Of course, 271G doesn't have the same genesis that 101 has with clear statements in the legislative history and in Supreme Court decisions about anything under the sun made by man, with the exception of certain stated categories. So there's a long history of Section 101 being interpreted very broadly and given a very expansive scope, limited only by things that are clearly fundamental matters of either nature or other abstract concepts that are already within the public realm. So that's a distinction. It's certainly a distinction with respect to the Bayer and NTP cases, I think. Well, in the end, although that is an often quoted statement, anything under the sun made by man, as this Court pointed out in previous cases, including Warmerdam and Arrhythmia, Congress did not so mandate that anything under the sun made by man can actually be patented. And in fact, fair enough, that's not the language in this statute. Right. And as you said, as this Court said in Warmerdam, Congress did not so mandate Congress including patentable subject matter only those things that qualify as any process, machine, manufacturer, composition of matter. And then later the opinion says to include some things is to exclude others. So I don't think we can read that legislative history statement to just completely engraft it over Section 101 and say anything that's made out of anything can be eligible for patentability. In fact, what we have to do is, in fact, go through the Supreme Court precedent of what that term means and then see how it's been used by this Court. And when the agency went through all the case law, all the signals point to, sorry for using the word signals, but all signs lead to the final conclusion that intangible subject matter is not eligible for patent. And no court has ever held that, and if we're going to say that something without any matter can be a manufacturer, well, that's a pretty big step. Mr. Chairman, how would you describe the intangible result? Are you talking about the useful concrete tangible result? Yes, useful concrete tangible result. Don't we have that here? I wouldn't necessarily say that we have that here because, first of all, the way this is claimed, this is abstract, as we mentioned before, and secondly, even if it was a signal, signal as it exists during transmission, where it's floating around in the sky, I don't think its functionality can be realized at that point. When it's actually in the machine and actually performing the function that it's supposed to perform, at that time, you can realize the useful concrete tangible result. When it's just flying around in the sky, it's just until it's trapped, basically. Does it have to be flying around in the sky? That was described in the Claim 14? It doesn't say that, does it? No, it doesn't. In fact, like we've already said, it can be just a series of ones and minus ones, but it could also be transmitted along a wire, an electrical signal. It could be in an optic fiber cable where there's light waves that are shooting down the cable. And so those are other examples of data transmission. And in all those contexts, I don't know if we have a useful concrete tangible result during the transmission portion. I mean, that time where it lasts maybe two seconds, the signal is measurable, it's discernible. So in that sense, it exists, does it not? We don't deny that it exists, but what we're trying to say is it doesn't have any matter. It doesn't have any mass. As opposed to energy? As opposed to energy, yes. Well, I don't know. And that's the concern we have here. Wouldn't our friend Mr. Einstein say that the two are the same? No, he wouldn't say it's the same. He would say that under extreme circumstances, you can convert mass into energy. Like, for example, an atomic bomb, nuclear fission. But atomic bombs and nuclear fission are not what's going on when you're transmitting a signal from point A to point B, whether it's by a radio frequency wave or an optical wave or an electrical wire. And so, yes, there is a relationship between energy and mass in that very extreme circumstance. But that doesn't mean that energy is mass. You can't hold energy. I guess the point is that whether it's energy or mass or matter, the point is the claim calls for a signal. And again, I want to get back to something I mentioned in the beginning. To signal something means that somebody has to understand something at the other end. Otherwise, there's no signal. It has to have some capability of being physically manifest in some way. Isn't that enough tangibility to satisfy 101 as a manufacturer? Well, when I snap my fingers like this, the question is, does that sound like a manufacturer? And if so, from what raw materials did I produce that from? That's the Supreme Court's formal statutory construction of the term manufacturer. And, yes, signals have some perceptibility. But the question is whether the Supreme Court's statements in Chakrabarty and on the case at Saididus, whether that was intended to be the definitive definition or merely a statement. I don't think anybody would disagree with the statement that a manufacturer is something made from raw materials. But the question is when that statement was made. And, of course, in Chakrabarty the issue was not really whether something was a manufacturer or not. The issue was the patentability of a living organism. And that's a slightly different proposition that was really at stake in that case. It seems to me that the Supreme Court hasn't clearly answered the question before us. Well, my understanding is when they said in American Fruit Growers that we're going to take the ordinary meaning, and they went to a dictionary and they found that it means articles produced from raw materials, that was the interpretation. And now the next question, the next step for the rest of us is to go out and try to figure out which things are in fact articles made from raw materials and which things are not. And then in this Court's cases in Bayer and NTP, I think they are instructive. I think they are helpful. Yes, it's a different context. I'm not saying that they completely foreclosed the entire situation here. But at the same time, what the Court did in Bayer was define manufacturing again. And they used American Fruit Growers' interpretation of manufacturing. Then it went out and also found two more contemporary dictionary definitions, one from Webster's and one from Randomance. And all three definitions are right on top of each other. They're co-extensive. They all say essentially the same thing. You've got to have basically concrete inputs to make a concrete output. And so there is a tangible object requirement within manufacturing. That's how it's defined in Bayer. Then when you go to NTP, I think when you think about a case where the facts are the closest to the situation we have here, to me that's NTP, where we were dealing with a product made for the patent process, which was a transmitted email that was going over a wireless radio frequency network to be received by a mobile RF receiver. But that was under 271G, not 101. That was 271G, but 271G, this Court has already held, means the same thing as manufacturing. And then manufacture means tangible object, physical product, defined article to mean a class of goods, one of a class of material. And so everything there is going towards saying there is a tangibility requirement. It has to be an object. It has to be something you can go down to the store and pull off a shelf, that kind of object we're talking about. You can't do that with energy. You can't somehow hold energy. And in NTP, those were transmitted emails. And when they're being transmitted over this wireless RF network, to me that looks and smells a lot like a signal that was going on in that case. And that case, NTP said, that particular signal is not a 271G product. Theirs is a 271G product equals manufactured. Therefore, when we look at those cases, and we look at the string of thinking, we're left to conclude that likewise, signal cannot be manufactured in a 101 context. I just wanted to briefly get to your Morse question. You asked about Claim 5. And I think this case is really close to Claim 8. Claim 5, first of all, was about a system of signs, of lines and dots and dashes to be used for telegraphic purposes. But that claim is more about creating an alphabet, creating a coding language. And it didn't have anything to do with the actual electrical signals or pulses that were being transmitted that would ultimately get decoded and you'd see written as the dots and lines and dashes on a piece of paper at the end of the transmission. Claim 8, however, Claim 8, which the Supreme Court held devoid, was a claim for the use of electromagnetic energy to carry information for telegraphic purposes. Now, to me, that sounds a lot closer to a signal and using electromagnetic radiation to transmit information from A to B. Of course, that claim would have encompassed an entire field of endeavor, namely the use of electromagnetic energy. And so it's sort of an over-breadth problem. There is a written description issue in Morse, and obviously this Court has recognized that in the past, but other people think that claim 8 in Morse also has a 101 issue steeped in there. The Supreme Court discussed this case, O'Reilly v. Morse, in its Gottschalk v. Benson case, which was a 101 case. So I think there is a 101 element there. So... This is just energy and information, and in close, we don't think that the case law has any suggestion that we should cross this line to go from matter to energy. But at the same time, we're not saying that this type of innovation can't get any form of patent protection. In this particular case, Mr. Nreeton is getting a claim on the apparatus for generating the signal. He's getting a claim for the method of generating the signal. He's also getting a claim for a storage medium containing the signal. At least the Board has found all those three types of claims to be eligible. And in our view, if we're going to expand 101 to include man-manipulated energy forms, it appears to us that that would be something that's best left for Congress to decide on where to draw the lines, just as this Court mentioned there with regard to 271G. What's the principal distinction between the rejection of Claim 14 and the allowance of the claim to the storage medium containing the signal? Well, the distinction there is that at least in Claim 15, we finally have a tangible object deal, the storage medium itself, the floppy disk. And so therefore, it can be potentially eligible as an article of manufacturing. Whereas in Claim 14, it's not tied to anything. It's not even tied to a transmission medium, like an electromagnetic wave. But the only thing that gives that floppy disk any significance is the information contained on it. Right. But at least in that instance, now that you've... It seems to be the height of form over substance when you say, well, the information is not patentable, but if you put it on a disk, a common, ordinary disk, then it's patentable, just because it's on a disk. I think the line of thinking on why the Board found Claim 15 to be okay under 101 comes from the Lowry-Beauregard cases from 10 years ago, where we wanted to actually reject Lowry's data structure on a disk. But this Court said, no, it was fine. And so because of that, in Beauregard, which was a software program on a disk, we declined to pursue that in view of Lowry. And so I think what you're seeing here is an extension of what happened in Lowry and Beauregard. So the only principal distinction between the two is not one based upon any analysis of the statute, but simply the constraints under which you function under our precedent. Claim 15 is a reaction to what happened in Lowry-Beauregard, yes. So perhaps neither should be patentable. I suppose that's where you would prefer to find yourself. In our view, that's not before us today. Yeah, I realize that. Thank you. Thank you, Mr. Chin. Mr. Hankin, you have five minutes. Thank you, sir. Let me first talk about the 279G cases of Bayer and NTP. And I think the important point of those cases is this court looked at and made abundantly clear that the standards for whether or not an infringement occurs under Section 271G are very different from the standards of Section 101. The quote in our brief is that Section 271G and Section 100 are not coextensive in their coverage. That's from NTP. There's similar language in Bayer. The patent office spoke about what I would say was the ephemeral nature of the transmitted signals that at some point when they're flying around in the sky, they can't be grasped in your hand or whatever. There's a long line of chemical cases from this court that says the ephemeral nature of an invention, the fact that it's transitory, does not make it unpatentable. But this is more than just transitory. You can't put your arms around it, can you? You can't put your arms around it, but you can't put your arms around it, I think, what Mr. Chen was saying, while it's being transmitted from transmitter A to receiver B. When it's in the transmitter or when it's in the receiver, you can put your arms around it. But that's what you're claiming, right? I mean, you're claiming a signal which contains no matter. You're not claiming the signal in conjunction with either a transmitter or a receiver, whereas Claim 14 is articulated. That's correct. But the fact that at some point in the sky it's different from when it's in the electrical circuit or in the disk is unimportant, we think, to the claim. The fact that at times you can't hold it in your hand, like you couldn't claim a chemical intermediary or a polymerizing agent after it was created and before it reacted was unimportant. But those are made of matter. Yes. And you concede that the signal is not made of matter, correct? The signal is not made of matter. The signal can be made of matter, but it's usually not made of matter. But the claim is so broad as to encompass those not made of matter as well. Yes, but it's tangible. There's a difference between being made out of matter that Plattenworth seems to equate being made of matter with being tangible. One of my colleagues uses the example that it would be hard to convince someone who's been struck by lightning that electricity is not tangible. It can be sensed, it can be felt, it can be distinguished from the background. If you look at the three requirements, if you would, useful, tangible, concrete. Concrete, according to the Patent Office's own interim guidelines, means repeatable. Tangible, we believe, doesn't mean that it has to be made out of matter, only that it can be distinguished from the background. Useful, we think that signals are... that signals have uses. So I think that we've met all of the examples and all the requirements. I have nothing more to add. Let me ask you just a couple of questions before you sit down. That is, it seems to me you're asking for an interpretation that would sanction some very, very broad claims covering some subject matter that heretofore might not have been considered patentable subject matter. For example, what if you had a claim that simply claimed a sequence of sounds arranged in a predetermined order? Would that be patentable subject matter? It's made by man. It has some manifestation. It can be perceived. It's theoretically useful. Is that patentable subject matter? Judge Lynn, I think that if it's novel, if it's unobvious, and if it has a use, a technical use, if you would, it doesn't fall under the exceptions that say music by itself or spoken words by themselves are not patentable subject matter. Yes, I think it would be patentable. Even though there's no physical, tangible thing? I think certainly, for example, the process of creating the sounds, the sounds to chase cockroaches out of your apartment or call animals in a hunting situation, I think certainly the process would be patentable. And I see no reason that the sounds themselves would not be patentable. Thank you, Mr. Aiken. The case is submitted.